

**SIGNED THIS 1st day of September, 2021**

**THIS MEMORANDUM OPINION HAS BEEN ENTERED ON THE
DOCKET. PLEASE SEE DOCKET FOR ENTRY DATE.**

*Rebecca B. Connelly*
_____
Rebecca B. Connelly
UNITED STATES BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| In re:<br>**WILLIAM MARSHALL BELL,**<br>　　　　　Debtor. | **Chapter 7**<br><br>**Case No. 19-50991** |
| **WILLIAM MARSHALL BELL,**<br>　　　　Plaintiff, | |
| v. | **Adv. P. No. 20-05001** |
| **U.S. DEPARTMENT OF EDUCATION,**<br>　　　　Defendant. | |

### MEMORANDUM OPINION

This case involves an individual debtor for whom the repayment of his student loan debt is an undue hardship.  He filed a complaint to discharge his student loan under Bankruptcy Code section 523(a)(8).  For the reasons below, this Court will grant the request in his complaint and order that the student loan debt be discharged pursuant to Bankruptcy Code section 523(a)(8).

*The Parties*

William Marshall Bell filed a chapter 7 bankruptcy petition, *pro se*, in November 2019. *See* Case No. 19-50991, ECF Doc. No. 1.  Mr. Bell is the plaintiff in this adversary proceeding.

Mr. Bell owes student loans to the United States Department of Education ("DOE"). The DOE is the defendant in this adversary proceeding.

Mr. Bell is requesting a discharge of his student loans. The DOE opposes his request.

*The Loans*

In the years before he filed bankruptcy, Mr. Bell enrolled in Strayer University: a for-profit university offering bachelor's and master's degrees, primarily by online learning. Mr. Bell incurred student loans to pay the tuition for the online school. Ultimately, he incurred multiple student loans in the years 2011, 2012, 2013, and 2014. *See* Joint Stip. of Facts ¶ 1, ECF Doc. No. 27. According to the parties' stipulation of facts, Mr. Bell was originally issued ten loans. Two of the loans have been paid in full. The final loan appears to never have been disbursed or was cancelled. *Id.* ¶ 12 n.1.

Seven of the student loans are outstanding. *Id.* ¶ 1. They are Direct Stafford Loans. *Id.* The loans were provided in the years 2011–2014. *Id.* The repayment period on the loans was originally ten years.[1]

The interest rates on these outstanding student loans range from 5.41% to 6.80%. *See id.* Daily interest accrues at $14.70 per day.[2] *See id.* ¶ 3. As of December 2020, the total loan balance had grown to $109,983.88,[3] of which $24,710.41 is current interest and $10,892.47 is capitalized

---

[1]   The repayment periods for the loans at issue began in September of 2015. *See* Ex. A. to Joint Stip. of Facts, ECF Doc. No. 27-1. Thus, Mr. Bell would have had approximately four years remaining under the original repayment period.

[2]   Due to a combination of legislation and administrative action in response to the COVID-19 pandemic, interest on the loans ceased accruing on March 13, 2020, and at this time is not set to continue accruing until, at the earliest, January 31, 2022.

[3]   Paragraph one of the joint stipulation provides a summary chart of Mr. Bell's Direct Stafford loans. The grand total of the current amount due, adding current interest to current principal as stated in the chart, equals $108,983.88. However, it appears that a mathematical or typographical error occurred for the second loan on the chart. For the second loan listed on the chart, the sum of the capitalized interest amount ($2,870.65) and the disbursement amount ($20,500) is $23,370.65; however, the current principal amount for this loan as listed in the chart is $1,000 less ($22,370.65). As such, this Court will account for this minor error and use the increased grand total of

interest.[4]  *See* Ex. A, ECF Doc. 52-1; Joint Stip. of Facts ¶ 1, ECF Doc. No. 27.  This means almost 33% of the current loan balance is interest.

*The Debtor*

When Mr. Bell filed his bankruptcy petition in November 2019, he was 67 years old.  At that time, he worked as a driver for a limousine and travel service.  Transcript at. 14:3–23, ECF Doc. No. 55 [hereinafter Tr.].  After he filed his bankruptcy petition, the COVID-19 global pandemic occurred curtailing travel.  Consequently, his employment income plummeted.  In response, he picked up work as a substitute teacher while continuing his efforts to obtain permanent full-time employment.  *See* Tr. 15:7–16:17.

In the years before filing bankruptcy, Mr. Bell earned a Master of Science degree from the University of Maryland.  *See* Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 37.  The education expense for that degree has been paid in full.  Tr. at 53:9–23; 57:3–13.  Mr. Bell worked full time while in school and qualified for an employer reimbursement program to help pay that education debt.  *See* Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 37; Tr. at 57:3–20.

Mr. Bell worked in customer relations for Hertz Rental Car and later as a processing center manager for the Virginia Department of Motor Vehicles.  *See* Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 37; Tr. at 51: 1–9.  While working at the Virginia Department of Motor Vehicles, he learned of an opportunity to increase his income by moving to the D.C. Department of Motor Vehicles.  Tr. at 51:21–23.  He pursued that opportunity and obtained employment with the D.C. Department of Motor Vehicles.  Tr. at 51:21–23.  While working at the D.C. Department of Motor

---

$109,983.88 for the calculations in this opinion.  This Court notes that its analysis remains unaffected even if this Court used the lower grand total.

[4]      This amount continues to grow from the original $74,381 that Mr. Bell borrowed.  *See* Joint Stip. of Facts ¶ 1, ECF Doc. No. 27.

Vehicles, he began efforts to obtain a job with the federal government with hopes to qualify for retirement benefits. *See* Tr. at 53:24–54:4; Pl.'s Mot. for Summ. J. at 7–8, ECF Doc. No. 37.

In 2011, Mr. Bell enrolled in a Master of Public Administration ("MPA") program online through Strayer University, believing the education from Strayer would lead to full-time employment with the federal government, which he understood would provide him with income for retirement. *See* Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 37; Tr. at 53:24-54:4. He graduated in 2014, five years before he filed bankruptcy. *See* Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 37.

Mr. Bell recounted:

> I started this program at Strayer College to enhance my ability to get federal employment. That was the whole purpose . . . . [for] the degree I got with the student loan [Master of Public Administration]. The idea being that it would enhance my ability to get federal employment. I already had a Master's degree in managing, customer service, and marketing, and that kind of thing, sales and all this kind of stuff. I mean, that was already, I already paid, I paid for that. I even got a loan for part of it, but everything was repaid. . . . The thing that I was trying to do, was to get, was to get this federal employment so that I could get the benefits so I could retire at seventy years old . . . .
> [M]y retirement income would have been substantial enough to cover a payment plan that would allow me to repay it. . . . [T]hat's part of the reason why I was seeking the federal employment.

Tr. at 53:7–9, 53:17–54:1, 54:25–55:3.

When asked why he thought he needed an MPA from Stayer University to help him obtain federal employment, Mr. Bell explained:

> [W]hat I had was a Master's in Marketing, so that's customer service. . . . [T]he government people look at that as business related. Okay, you know how to sell. You know how to manage certain types of work flows, private work flows, in the private sector . . . . But government requires an understanding of, of bureaucracy. Government requires an understanding of federal agencies. The government requires an understanding of, the biggest thing was how the money is being dispersed.

Tr. at 56:7–16.

4

Mr. Bell did obtain some employment with the federal government.  In late 2013, he began

a temporary position in customer service for the Small Business Administration, Office of Disaster

Assistance ("SBA").  Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 37.  He then obtained a position

with the Federal Emergency Management Agency ("FEMA") as a program specialist, but at the

end of his probationary period, in March 2019, was placed on leave without pay, which continued

until June 2019 when his FEMA employment officially terminated.  *Id.* at 7–8; Tr. at 14:1–10.  In

June 2019, he obtained work as a driver for a limousine service.  Pl.'s Mot. for Summ. J. at 8, ECF

Doc. No. 37.

To obtain the MPA degree, Mr. Bell incurred the student loans he now seeks to discharge.

Tr. at 54:14–18, 57:15–17.  The repayment period for the loans did not begin until 2015.[5]  Mr. Bell

recounted, "once you graduate or finish school, there's a year grace period."  Tr. at 28:20–21.  He

went on to explain how his loans were placed in forbearance.

> After this grace period, they say, 'Well, what's your income?'  You send in the
> forms, what's your income, and everything like that.  And then they say, 'Okay
> based on this, if you apply for forbearance you can get forbearance.' . . .  [The
> forbearances were] granted by the Department of Education. . . .  [These
> forbearances are] only good for a year . . . [Y]ear after year I was able to show [my
> eligibility for a forbearance].

Tr. at 28:21–29:8.

During this period, Mr. Bell's income was insufficient to cover living expenses and the

loan payments.  The documents filed with this Court show that in March 2015, the loans were

approved for a general forbearance for the period April 2015 to April 2016.  *See* Ex. B at 5, ECF

Doc. No. 52-2.  The following year, in March 2016, Mr. Bell reported his monthly income from

---

[5]      For example, according to Exhibit 3 that Mr. Bell attached to his May 3, 2021, supplemental filing, the loan
issued on July 10, 2014, did not have a "loan repayment begin date" until September 24, 2015, more than a year after
the loan issue date. Pl.'s Exs. at 30, ECF Doc. No. 46. The same exhibit shows that the loan issued on July 10, 2014,
had a status of "IN GRACE PERIOD" as of March 24, 2015. *Id.* at 31; *see also id.* at 3, 30–42.

all sources totaled $2,291.47, with a gross pay of $1,057.60 per two-week pay period.  Ex. C at 1, 4, ECF Doc. No. 52-3.  The DOE approved the loans for a Student Loan Debt Burden Forbearance for the period April 2016 through April 2017.  *Id.* at 5.  In 2017, Mr. Bell reported no taxable income and requested a temporary forbearance for the period April 2017 until April 2018.  Ex. D at 1, ECF Doc. No. 52-4.  The DOE granted it.  *Id.* at 5.  In March 2018, Mr. Bell reported monthly income of $1,326.00.  Ex. E at 1, ECF Doc. No. 52-5.  The monthly loan payments at that time were $1,004.50.  *Id.*  The DOE granted Mr. Bell a Student Loan Debt Burden Forbearance for the period April 2018 to March 2019.  *Id.* at 6

In 2019, the DOE approved Mr. Bell for a temporary general forbearance for the period April 2019 until May 2019.  Ex. F at 1, ECF Doc. No. 52-6.  Mr. Bell was then placed in an "Income Driven Repayment" ("IDR") Plan titled "Pay As You Earn" ("PAYE").  *See* Ex. G at 1, ECF Doc. No. 52-7.  The DOE wrote, in a letter addressed to Mr. Bell:

> We used your income documentation and family size to determine your new monthly payment of $0.00 which is due on 05/06/2019.  Your new monthly payment amount is effective for all payments due between 05/06/2019 and 05/06/2020. . . . If you do not recertify or you no longer have a partial financial hardship (PFH), your payment amount will be $1,176.40.

*Id.*

The "income documentation" referred to includes Mr. Bell's application in March 2019, which revealed annual adjusted gross income of $5,871.  *See* Ex. H at 1, ECF Doc. No. 52-8.  These numbers are consistent with Mr. Bell's answers in his bankruptcy petition about his current and past income.[6]  The DOE wrote to Mr. Bell the following year.  Once again, the DOE said,

---

[6]      Mr. Bell's Statement of Financial Affairs (Official Form 107) shows total income from January 1, 2018, to December 31, 2018, of $5845, and total income from January 1, 2017, to December 31, 2017, of $48,369.  *See* ECF Doc. No. 1 at 45, Case No. 19-50991 (Bankr. W.D. Va. Nov. 14, 2019).  The periods reported on the loan forbearance application to the DOE were based on a different twelve-month period than the Statement of Financial Affairs.

"[w]e used your income documentation and family size to determine your monthly payment of $0.00 which is due on 05/06/2020. Your new monthly payment amount is effective for all payments due between 05/06/2020 and 05/01/2021."[7] *See* Pl.'s Exs. at 48, ECF Doc. No. 46.

Mr. Bell simply did not have the ability to service the loan. He recalled:

[I]t took almost a year to even get this job with FEMA. Because of doing all the things that you have to do, the applications and waiting time and get the application in March and they make a decision in June, and then they don't hire you on the workforce until, until September or October.

Tr. at 29:11–16.

He further reported, "I spent all my money covering living expenses during this time frame when I had the job but had not started to earn income from the job." *Id.* at 29:19–22; *see also* Pl.'s Mot. for Summ. J. at 7–8, ECF Doc. No. 37. At the outset of the trial, he told this Court, "I came to Winchester to work with FEMA. That was the reason for my being here. I'm a native Washingtonian . . . ." Tr. at 8:21–23. As a result, he "packed everything up and moved to Winchester, and took this job with the expectation of continuing this job." Tr. at 9:6–8. He recounted how he "spent all [his] money. [He] spent over like $30,000 or so in just some money spent toward security deposits for moving fees and for everything because [he] thought this was a fix." Tr. at 9:19–22. After spending his savings to move to Winchester, he then lost the job for which he moved. *See id.* at 9:23 ("It didn't work out."); Pl.'s Mot. for Summ. J. at 7–8, ECF Doc. No. 37. In pleadings filed previously with this Court, Mr. Bell lamented that "for three months [he] was borrowing from [his] credit cards to pay [his] living expenses before [he] got a job as a driver with Reston Limousine in June 2019." Pl.'s Mot. for Summ. J. at 8, ECF Doc. No. 37.

---

[7] Rather than modify the loans, monthly "payments" are temporarily reduced to "zero" until either the debtor certifies that he or she earns sufficient income to pay more per month, or the debtor fails to timely submit his or her annual certification. During the program, interest continues to accrue against any unpaid principal. And so, the debt grows.

Given these facts, it is not surprising the DOE determined, based on Mr. Bell's earnings, his monthly payment for his student loans to be zero. Mr. Bell's earnings reflect an inability to pay the loan payment.

*The Complaint*

After filing bankruptcy, Mr. Bell filed a complaint requesting that this Court determine that repayment of the student loan debt is an undue hardship for him, and therefore, under Bankruptcy Code section 523(a)(8), the student loan debt should not be excepted from discharge. *See* Compl., ECF Doc. No. 1. After repeated efforts, Mr. Bell served his complaint on the United States and the DOE. ECF Doc. No. 16. The United States responded on behalf of the DOE. Ans., ECF Doc. No. 19. In its response, the DOE contends that Mr. Bell has not shown the onerous requirements to permit this Court to find repayment of the debt is an undue hardship because, according to the DOE, he does not satisfy the three-part test established in *Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*, 831 F.2d 395 (2d Cir. 1987).

**ANALYSIS**

*Section 523(a)(8)*

Under Bankruptcy Code section 523(a)(8), student loan debt[8] is excepted from discharge unless excepting the debt from discharge imposes an undue hardship on the debtor. The language of the statute permits a bankruptcy judge to discharge student loan debt. Specifically, a discharge under the Bankruptcy Code does not discharge an individual from student loan debt "unless excepting such debt from discharge would impose an undue hardship on the debtor." 11 U.S.C. § 523(a)(8). If the debt is not discharged, it remains an obligation to be repaid. It follows then, if

---

[8]     This opinion uses "student loan debt" to describe the debts excepted from discharge under section 523(a)(8). Section 523(a)(8) lists various types of educational debts that fall within the 523(a)(8) exception to discharge. Case law has developed on what specific types of debt fall within section 523(a)(8)'s reach. It is undisputed in this adversary proceeding that the student loans Mr. Bell seeks to discharge fall within section 523(a)(8).

repayment of that obligation is an undue hardship on the debtor, under section 523(a)(8) a bankruptcy judge may grant a discharge of the student loan debt.  In this way, Congress has authorized a bankruptcy court to decide when repayment of the student loan debt is an undue hardship.

In attempting to apply the undue hardship language, courts have strayed from a natural reading of the statute to develop judicial tests.  Most Circuit Courts of Appeal, including the Fourth Circuit, have adopted a version of the test delineated in *Brunner v. New York Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987).  *See Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 401 (4th Cir. 2005).  The United States Court of Appeals for the Eighth Circuit and the Bankruptcy Appellate Panel for the First Circuit, however, have adopted a different test: the "totality of the circumstances" test.  *See Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 553 (8th Cir. 2003); *Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 800 (B.A.P. 1st Cir. 2010) (concluding "that Brunner takes the test too far").

Under the *Brunner* test, to prove an "undue hardship," the debtor seeking discharge of student loans under section 523(a)(8) must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

By comparison, the totality of the circumstances test requires a debtor to prove by a preponderance of evidence that:

> (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in

9

question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts.

*Bronsdon*, 435 B.R. at 798; *see also Long*, 322 F.3d at 554.

On one hand, the first prong of the *Brunner* test lines up with the factors considered under the totality of the circumstances test. On the other hand, "the *Brunner* test imposes two additional requirements [prongs two and three] on the debtor that *must* be met if the student loans are to be discharged." *Bronsdon*, 435 B.R. at 799 (quoting *Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18, 26 (Bankr. D. Mass. 2005)).

The totality of the circumstances test concentrates on the ability to pay the debt. In other words, what factors, if any, on balance prevent the debtor from paying the debt while maintaining a minimal standard of living. Alternatively, the *Brunner* test looks to the debtor's financial condition and life choices along with any potential ability to pay in the future.

Under the totality of the circumstances test, appropriate relevant factors are weighed and no one factor is determinative. By contrast, the *Brunner* test factors are mandatory requirements, and the absence of a single requirement bars a bankruptcy court from concluding that repayment of student loan debt places an undue hardship on a debtor. *See Frushour*, 433 F.3d at 400 ("The debtor has the burden of proving all three factors by a preponderance of the evidence.").

The Fourth Circuit has adopted the *Brunner* test. *See Frushour*, 433 F.3d at 400. This Court therefore will apply the *Brunner* test to determine if Mr. Bell's complaint under section 523(a)(8) may be granted.

Faced with both a statutory directive and an appellate directive, coupled with ranging applications of these directives among the circuits, it is fitting to recall the history of the *Brunner* decision and the progression of the statutory language.

*The History of Bankruptcy Code Section 523(a)(8) and the* Brunner *Test*

10

The enactment of Title 11 of the United States Code in 1978 provided the first iteration of section 523(a)(8)'s exception to discharge for certain student loan debt:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt— . . .
>        (8) to a governmental unit, or a nonprofit institution of higher education, for an educational loan, unless—,
>               (A) such loan first became due before five years before the date of the filing of the petition; or
>               (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents; . . . .

Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 523(a)(8), 92 Stat. 2549, 2591 (1978).

As originally enacted, section 523(a)(8) contained two bases for exception to the exception to discharge of certain student loan debt. First, pursuant to section 523(a)(8)(A), if the first payment on the educational loan had become due more than five year prior to the filing of the debtor's bankruptcy petition, the debt was dischargeable. Second, pursuant to section 523(a)(8)(B), the debt was dischargeable only if excepting the debt from discharge would impose an undue hardship on the debtor and the debtor's dependents.

Stated differently, the general rule was that section 523(a)(8)(A) "declare[d] such [student] loans nondischargeable for five years after they first came due, but § 523(a)(8)(B) create[d] an exception to the general rule if the failure to discharge would 'impose an undue hardship on the debtor and the debtor's dependents.'" *Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 753 (S.D.N.Y. 1985). Based on the legislative history, these provisions were "designed to remedy abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing for bankruptcy shortly after graduation, and to safeguard the financial integrity of educational loan programs." *Santa Fe Med. Servs. v. Segal (In re Segal)*, 57 F.3d 342, 348 (3d Cir. 1995).

In 1979, Congress amended section 523(a)(8) to strike out "to a governmental unit, or a nonprofit institution of higher education, for an educational loan" in the umbrella of section 523(a)(8) and replaced the language with "for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution of higher education." Pub. L. No. 96-56, § 3, 93 Stat. 387, 387 (1979). This amendment had the effect of expanding the breadth of the types of student loan debt that were rendered nondischargeable. The 1979 amendments also clarified that section 523(a)(8)(A)'s five-year prepetition period calculation was "exclusive of any applicable suspension of the repayment period." *Id.*

It was under this backdrop that the United States Bankruptcy Court for the Southern District of New York, in 1983, considered whether a young debtor who sought to discharge student loans immediately after obtaining a graduate degree had shown that repayment of those loans was an undue hardship. At that time, Bankruptcy Code section 523(a)(8) permitted discharge of student loan debt if "such loan first became due before five years before the date of the filing of the petition," as an alternative to the undue hardship basis for discharge.

Ms. Brunner sought to discharge her student loan debt less than a year after graduation. *See Brunner*, 46 B.R. at 753. The bankruptcy judge issued an oral ruling discharging those loans. *See id.* On appeal, the district court identified potential abuse in permitting a recent graduate to obtain such an immediate discharge of student loan debt. In its written opinion, the district court crafted a three-part test to help determine whether repayment of student loans that first came due within five years of the bankruptcy petition date would be an undue hardship for that debtor. Student loans that first came due before five years of the petition date would not fall within the purview of the *Brunner* test because the debt would be dischargeable under what was section

12

523(a)(8)(A).  The district court's ruling in *Brunner* was affirmed, and the three-part test was adopted by the Second Circuit.  *Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*, 831 F.2d 395 (2nd Cir. 1987).  That three-part test is the *Brunner* test.

A few years after *Brunner*, the Crime Control Act of 1990 made two significant amendments to section 523(a)(8).  First, Congress again expanded the scope of the types of debt included in the section 523(a)(8) exception.  Specifically, Congress replaced the 1979 amended language starting with "for an education loan" through "unless" with "for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless."  Crime Control Act of 1990, Pub. L. No. 101-647, § 3621, 104 Stat. 4789,4964–65 (1990).  Second, the Crime Control Act enlarged the five-year period in section 523(a)(8)(A) to a seven-year period and expanded the type of debt from "loan made" to reflect the debts newly inserted into the general coverage of section 523(a)(8).

In 1998, Congress deleted subsection (A) of section 523(a)(8).  Higher Education Amendments of 1998, Pub. L. No. 105-244, § 971(a), 112 Stat. 1581, 1837 (1998).  This left only one basis for debtors to have their student loans determined dischargeable: proving an "undue hardship."

The most recent amendments to section 523(a)(8) occurred in 2005.  The amendments restructured the language, striking the then-existing (a)(8) in its entirety, and adding the following:

> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>     (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, Pub. L. No. 109-8, § 220, 119 Stat. 23, 59 (2005).  In addition to reordering the language, the amendments again expanded the types of student loans subject to the discharge exception beyond those insured or guaranteed by a governmental unit or made under any program funded in whole or in part by a governmental unit or nonprofit institution.  Throughout the evolution of section 523(a)(8), the phrase "undue hardship" has remained.

"Undue hardship" is not a defined term in the Bankruptcy Code.  Congress uses the phrase "undue hardship" in the current Bankruptcy Code once in section 523 and eight times in section 524.  *See* 11 U.S.C. §§ 523(a)(8), 524(c)(3)(B), (c)(6)(A)(i), (k)(3)(J)(i), (k)(5)(A)–(B), (k)(6)(A), (m)(1).  Section 524(c) governs the standards for an enforceable reaffirmation agreement.  Salient to the current analysis is section 524(m)(1).  This Code section explains the phrase "undue hardship" by providing a presumption that a reaffirmation agreement is an undue hardship "if the debtor's monthly income less the debtor's monthly expenses as shown on the debtor's completed and signed statement in support of such agreement required under subsection (k)(6)(A) is less than the scheduled payments on the reaffirmed debt."  *Id.* § 524(m)(1).  When the presumption is not rebutted, a bankruptcy court has the authority to disapprove the reaffirmation agreement.[9]

The presumption of undue hardship in section 524(m)(1) was added to the Bankruptcy Code when Congress enacted BAPCPA, which became effective on October 17, 2005.  Prior to the 2005 amendments, "undue hardship" appeared only three times in the Bankruptcy Code.  *See*

---

[9]    *See* 11 U.S.C. § 524(c)(3)(B).

11 U.S.C. §§ 523(a)(8), 524(c)(3)(B), (c)(6)(A)(i) (2000).  Although rebuttable, the presumption

in section 524(m)(1) provides a comparison of income less expenses to the monthly payments to

be made on the debt to be reaffirmed.  Stated differently, if the debtor's income less expenses

leaves insufficient income to make payments on the debt to be reaffirmed, the statute provides that

the presumption of undue hardship arises.  On the other hand, if making scheduled payments on

the subject debt is within the debtor's budget, no presumption of undue hardship arises.

The Fourth Circuit's opinions applying the phrase "undue hardship" in section 523(a)(8),

*Frushour* and *Spence*, were issued after the effective date of BAPCPA.  Each opinion, however,

was on appeal from decisions entered by the bankruptcy courts in cases filed prior to the enactment

of BAPCPA.[10]  Since the provisions of BAPCPA did not apply to cases filed prior to October 17,

2005, the statutory language of section 524(m) was not a consideration in the bankruptcy courts'

decisions nor in the subsequent decisions on appeal in *Frushour* and *Spence*.  Indeed, the Fourth

Circuit in each opinion cites to the 2000 edition of the United States Code.  *Frushour*, 433 F.3d at

398; *Spence*, 541 F.3d at 541.

In establishing a baseline determination of "undue hardship" for purposes of section

523(a)(8), this Court finds informative section 524(m)(1)'s undue hardship comparison between

the debtor's income less expenses, on the one hand, with the repayment of a particular debt, on the

other.  This Court acknowledges that the inclusion of a calculation of a presumptive "undue

hardship" in repaying a debt in one part of the Code does not preclude a completely different

understanding of "undue hardship" in another.  In applying a statute, courts observe the "there is

---

[10]      The order discharging the debtor's student loans in the *Frushour* case was issued on July 21, 2004.  *See*
Order, *Frushour v. Educ. Credit Mgmt. Corp.*, Adv. P. No. 04-80047-wb (Bankr. D.S.C. July 21, 2004), ECF Doc.
No. 23.  The bankruptcy court in *Spence* issued the order discharging the debtor's student loans shortly after the
BAPCPA effective date (on November 16, 2005), but the adversary complaint to determine dischargeability was filed
on March 22, 2005.  *See* Order, *Spence v. Educ. Credit Mgmt. Corp.*, Adv. P. No. 05-01207-RGM (Bankr. E.D. Va.
Nov. 16, 2005), ECF Doc. No. 46.

a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). Yet, courts also remain mindful that "the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Id.* Here there appears to be at least some connection between the use of the phrase in section 523 and in section 524.

"Undue hardship" in both section 523(a)(8) and section 524 focuses on the burden for a debtor in repaying a particular debt post-discharge. In both sections, Congress characterized the repayment hardship as "undue." Both sections compel a bankruptcy court to evaluate the facts and circumstances of each debtor's financial situation, and specifically whether the debtor has the ability to repay that particular debt, in determining if the debt should survive the granting of a personal discharge.

If Mr. Bell's student loan debt were analyzed under the language of section 524(m)(1), a presumption of undue hardship would arise. The difference between Mr. Bell's income less expenses is less than the payment amounts necessary to repay his student loans; hence under a section 524 analysis, repayment of the student loans would be presumed to be an undue hardship. If this were the inquiry, then absent rebuttal, this Court would be satisfied that not excepting his student loans from discharge would place an undue hardship on Mr. Bell. The inquiry before this Court, however, is whether, under section 523, excepting Mr. Bell's student loan debt from his bankruptcy discharge would place an undue hardship on him. And so, guided by *stare decisis*, to answer this inquiry, this Court will not look to the language of section 524 and instead will apply

the three criteria of the *Brunner* test to decide if Mr. Bell has shown that excepting his student loan

debt from discharge would impose an undue hardship on him.

*Application of the* Brunner *Test to Mr. Bell*

The *Brunner* test requires a debtor to establish by a preponderance of the evidence three

"prongs":

> (1) that the debtor cannot maintain, based on current income and expenses, a
> "minimal" standard of living for herself and her dependents if forced to repay the
> loans; (2) that additional circumstances exist indicating that this state of affairs is
> likely to persist for a significant portion of the repayment period of the student
> loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

Based on the Fourth Circuit's application of the *Brunner* test, Mr. Bell must show all three

of the *Brunner* prongs for this Court to discharge the student loan debt.

## A. Prong One

The first prong of the *Brunner* test requires that the debtor show "that [he] cannot maintain,

based on current income and expenses, a 'minimal' standard of living for [him]self and [his]

dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. In this Court's Order dated

March 30, 2021, this Court concluded that, after reviewing Mr. Bell's current income and

expenses, as a matter of law he had satisfied prong one of the *Brunner* test. *See* Order at 10–11,

ECF Doc. No. 44. Mr. Bell put forward evidence and argument demonstrating that he made every

effort to reduce his monthly expenses from $4,232 to $3,963. Mr. Bell also showed, however, that

his monthly income had decreased from $4,472.25 to $2,738 since the filing of his bankruptcy

petition. *Id.* at 11. After reviewing the specifics of Mr. Bell's expenses and determining that, as

a matter of law, they were not frivolous, this Court was satisfied that his unbalanced budget made

it such that he could not maintain a minimal standard of living based on his current income and

expenses if forced to repay the loans. *Id.* This Court remains satisfied that Mr. Bell has met the requisite showing under prong one of the *Brunner* test, so this Court need not revisit prong one. At trial, the parties focused their arguments and evidence on prongs two and three of the *Brunner* test. This Court will do the same in this Memorandum Opinion.

### B. Prong Two

Prong two of the *Brunner* test requires the debtor to show "that additional circumstances exist indicating that [the debtor's] state of affairs [under prong one] is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. The test expressly requires a court to consider: (1) the debtor's current circumstances; (2) the likelihood that those circumstances will remain or persist; and (3) whether those circumstances are likely to persist during a significant period of the remaining term of the loan.

The Fourth Circuit has said that this part of the "undue hardship" test requires the debtor to show a "certainty of hopelessness" that he will not be able to repay the loan. *See, e.g*, *Frushour*, 433 F.3d at 401. This language directs a court to consider the reasons the debtor is unable to pay the debt and whether such reasons are certain, rather than merely likely, to persist. It is another way of saying the second prong is met only if it is futile or unreasonable to suggest this debtor will in fact[11] be able to repay this debt during the term of the loans. *Brunner* directs a court to consider "the likelihood" that the debtor's current circumstances will remain not indefinitely but during "a significant period of the remaining term of the loan." In other words, under the *Brunner* test, the debtor is not required to prove that his circumstances will not ever improve. Mindful that the directive from this Circuit is to apply the *Brunner* test, this Court interprets the standard of

---

[11]     This Court construes the language of *Frushour* consistent with a judge's duty to avoid speculation or supposition of possibilities not supported in the case record. Accordingly, this Court will consider the facts in the record without conjecture.

"certainty of hopelessness" for the undue hardship requirement to necessarily pertain to whether it is a "certainty of hopelessness" that the debtor will not be able to repay the debt, not whether it is a "certainty of hopelessness" that a debtor's financial balance sheet will not at some point improve.

In evaluating prong two of the *Brunner* test, this Court will consider the debtor's education, professional licenses, breadth of employment history, previous employment income versus current income, and effort to find a higher paying job. *See Frushour*, 433 F.3d at 401 ("Having a low-paying job, however, does not in itself provide undue hardship, especially where the debtor is satisfied with the job, has not actively sought higher-paying employment, and has earned a larger income in previous jobs."). In so doing, this Court will evaluate whether his circumstances are not likely to improve during a significant portion of the repayment period, such that this Court may find his ability to repay the loans is a "certainty of hopelessness."

Mr. Bell has a Master of Science degree from the University of Maryland and an MPA degree from Strayer University. Mr. Bell has previous and current employment history. His employment, with his education, has at times provided him with income between $40,000 and $50,000. *See* Statement of Financial Affairs, ECF Doc. No. 1 at 45, Case No. 19-50991 (Bankr. W.D. Va. Nov. 14, 2019) (showing that in 2017, Mr. Bell's total income was $48,369; in 2018, Mr. Bell's total income was $5845;[12] from January 1, 2019, to November 2019, Mr. Bell's total income was $40,862); *see also* Resp. at 2–8, ECF Doc. No. 43.

Since obtaining his MPA, Mr. Bell's income has fluctuated while he attempted to obtain higher or more stable income. As of 2013, he had a temporary position in customer service for the

---

[12]     During 2018, Mr. Bell was hired for a position with FEMA, but during the pre-employment process did not receive income. *See* Tr. at 30:2–9, 39:10–11. On the application for mandatory forbearance he signed on March 17, 2018, he reports total monthly taxable income as of that date as $1326. Pl.'s Exs. at 44, ECF Doc. No. 46; Ex. E at 1, ECF Doc. No. 52-5.

SBA.   The position was interim and did not include benefits.   *See* Tr. at 36:10–19.   He supplemented the SBA work with hourly wage work for the Environmental Protection Agency (EPA).   *See* Tr. at 37:24–38:7, 38:19–39:5.   Still looking for permanent employment with benefits, Mr. Bell engaged in a robust job search for public and private sector jobs ranging from lower skill to higher skill positions.   *See* Pl.'s Exs. at 5–26, ECF Doc. No. 46.   In 2018, Mr. Bell obtained a job with FEMA.   *See* Tr. at 39:10–11.   The position required extensive background checks and a lengthy pre-employment process.   Tr. at 30:2–9.   Mr. Bell described the position with FEMA as one with benefits and one that would "lead to a more permanent status."   Tr. at 39:13–18.   He thought the position would lead to a greater salary and a more beneficial retirement plan.   "It was a GS-9 position, and I'd already had previous government experience so the likelihood was that I was going to be a GS-11 within a year, and so my income would have been like right around $72,000 a year.   So that was my goal."   Tr. at 9:8–12.   In 2019, Mr. Bell started working with FEMA in Winchester, Virginia, but at the end of his probation period, still in early 2019, he was placed on leave without pay.   Tr. 14:3–5, 36:10–19.   After losing the job with FEMA, he resumed his job search and continued to hunt for better employment even after accepting a position as a driver with Reston Limousine Service.   *See* Tr. at 13:9–14:11.   During the COVID-19 pandemic, when Mr. Bell's hours at Reston Limousine Service were drastically cut, Mr. Bell began work as a substitute teacher on an as needed basis.   Tr. 15:4–10; *see* Pl.'s Mot. for Summ. J. at 8, ECF Doc. No. 37; Resp. at 37–38, ECF Doc. No. 43.

When describing why he was not eligible for advancement or higher income with his current places of employment, Mr. Bell described the need to obtain certifications and licenses. *See* Tr. at 16:1–18:16.; Pl.'s Mot. for Summ. J. at 8, ECF Doc. No. 37.   Mr. Bell is not eligible for full-time employment as a teacher (as contrasted from work as a substitute teacher) without

certifications. *See* Tr. at 16:1–9; Pl.'s Mot. for Summ. J. at 8, ECF Doc. No. 37. Mr. Bell is not eligible for a higher salary as a driver without a Commercial Driver's License. *See* Tr. at 18:7–16. Even with such certifications, however, Mr. Bell's income would likely be $40,000–$50,000 per year. *See* Tr. at 17:10–18, 18:17–22.

Obtaining such certifications and licenses requires further education at an expense to Mr. Bell plus time to complete the education. *See* Tr. at 16:18–22:20. Mr. Bell urged this Court to recognize and consider the improbability that a senior citizen, aged 70 years or older, is hired for a long-term, career-track position, let alone actually stays in the workforce long enough to realize the advancement. *See* Tr. at 22:21–25:21, 60:17–61:4; Pl.'s Mot. for Summ. J. at 8, ECF Doc. No. 37.

Mr. Bell's employment history, experience, and current skills render him qualified for work in customer service and employee management. *See* Tr. 51:1–53:4. It is unclear such work would render a salary high enough to permit Mr. Bell to repay his student loans based on his actual earnings from work in these fields. His employment history in this Court's record shows that Mr. Bell's actual earnings, with his skills and experience, did not provide him sufficient income to make the payments on the student loan debt. *See* Ex. C at 4, ECF Doc. No. 52-3; Resp., ECF Doc. No. 43 at 2–9; Statement of Financial Affairs, ECF Doc. No. 1 at 45, Case No. 19-50991 (Bankr. W.D. Va. Nov. 14, 2019).

Mr. Bell provided to this Court support showing the strong but unsuccessful attempt to secure employment income sufficient to permit him to repay the student loans. *See* Pl.'s Exs. at 5–26, ECF Doc. No. 46. Mr. Bell explained his efforts to obtain employment with higher salary potential or career advancement. *See* Tr. at 13:7–15:25. Mr. Bell told this Court about the physical challenges of sustaining work in his later years, as well as the limited opportunities for high income

21

work in his later years.  Tr.  at 20:11–25:20.  The record shows undeniably that during the nearly

ten years since Mr. Bell obtained his student loans, he sought career advancement employment

opportunities.  The record shows he has had no success, despite his education.

In considering whether Mr. Bell's state of affairs is likely to persist during the remaining

years of the repayment period, this Court is persuaded by the uncontroverted evidence[13] showing

the salary ranges available to Mr. Bell during this time period.  Mr. Bell continues his employment

with Reston Limousine service as a contract driver.  With additional training and a Commercial

Driver's License, he could advance his income to "$40,000 or so a year . . . if [he] could do the

job at all."  Tr. at 18:22–23.  Even at that income, he would be unable to pay the monthly loan

payment of $1,176.40, let alone repay the $109,983.88 (and growing) total indebtedness during

the remaining years of the repayment period.  *See* Joint Stip. of Facts ¶ 1, ECF Doc. No. 27; Ex.

G at 1, ECF Doc. No. 52-7.

Mr. Bell is also currently working as a substitute teacher.  He is pursuing full-time work as

a teacher.  Tr. at 15:7–19:21.  His income as a substitute teacher is currently $150 per day, four

days per week or "right around $2,200 a month" gross income, and "around $1,600 to $1,800" net

income.  Tr. at 17:19–18:6.  Such income is not enough to pay the $1,176.40 monthly loan payment

or repay the $108,983.88 debt during the repayment period.  *See* Joint Stip. of Facts ¶ 1, ECF Doc.

No. 27; Ex. G at 1, ECF Doc. No. 52-7.  Mr. Bell emphasized his desire to obtain full-time work

and willingness to seek the necessary certifications for such employment, including efforts to

obtain a grant to cover the expense.  Even if he can do all this, at best, his income will likely be

"somewhere around $40,000 or $50,000 a year."  Tr. at 17:14–18.  Such potential, however, is not

---

[13]     The DOE did not contest the facts or Mr. Bell's evidence.  Counsel for the DOE demonstrated patience and leeway in permitting Mr. Bell a full opportunity to prove his complaint.  As such, no evidentiary or procedural objections were raised.  The DOE instead focused its contest over the application of the law to Mr. Bell's facts.

likely to occur during the remaining years of the repayment period.[14]   Even if it does, it is not sufficient to pay the standard monthly payment or repay the loan during the repayment period. Attempting to make such student loan payments, even assuming the most optimistic income projections, would impose an undue hardship on Mr. Bell.

Mr. Bell emphasized his objective to obtain a GS-11 position.  Under the GS-11 Pay Scale for 2021, the "[s]tarting salary for a GS-11 employee is $55,756.00 per year at Step 1."[15]   This equates to gross monthly income of $4,646.33.[16]   He believed such position would render income of $72,000.  Even with that income, it is not likely that he could repay the indebtedness during the repayment period, whether that period be the remaining years of the ten-year repayment period or the remaining years of a twenty-year term under the income-based repayment plan.  Mr. Bell believed a position with the federal government not only would lead to a GS-11 salary but also would include benefits and a retirement plan.  His belief was not realized.  It is futile at this point to expect it to occur in his future, given Mr. Bell's age.

Income in the range available to Mr. Bell as a teacher, a limousine or licensed commercial driver, a customer service manager, or a GS-9 federal employee is not sufficient to pay the indebtedness during the remainder of the repayment period, let alone to pay the indebtedness and maintain a minimum standard of living.  For example, Mr. Bell's employment with FEMA was at

---

[14]   The record is unclear as to the term of the repayment period.  The loans originally had a ten-year repayment period.  The forbearances may have extended this repayment period.  Mr. Bell's income-based repayment plan ("IBRP") carries a plan period of 20 years, but it is unclear in this record when that plan period commenced, or whether the IBRP term is the "repayment period" under the *Brunner* test, especially when the IBRP is not a repayment mechanism.  The *Brunner* test was written at a time when alternative, income-based repayment plans for federal student loans did not exist; similarly, the Fourth Circuit adopted the *Brunner* test at a time when these repayment plans were unavailable.  This new development has added more complexity to prong two's legal analysis, and begs the question—may the Department of Education effectively modify prong two's analysis by developing alternative, extended repayment plans?

[15]   *GS-11 Pay -2021 Federal GS Payscale*, FEDERALPAY, https://www.federalpay.org/gs/2021/GS-11.

[16]   *Id.*

a GS-9 paygrade. *See* Tr. 37:12–14. Under the GS-9 Pay Scale for 2021, the "[s]tarting salary for a GS-9 employee is $46,083.00 per year at Step 1, with a maximum possible base pay of $59,907.00"[17] The starting pay equates to a gross monthly income amount of $3,840.25. [18] The student loan debt has now become over $100,000 and accrues interest of $14.70 per day. The student loan monthly payments, based on the current principal and interest balance, require monthly payments of at least $1,176.40.[19] Nearly 33% of the loan balance is interest. Payments must first be applied to interest before application to principal, whether under standard repayment terms or an income-based repayment plan; so, it is unclear at what point the payments will repay the principal or what period is necessary to repay the loan. *See* 34 C.F.R. § 682.209(b)(1); 34 C.F.R. § 682.215(c)(1).

At the end of the day, the debtor's education, employment history, employment income, current income, efforts to find higher paying jobs, and lack of professional licenses support a finding that Mr. Bell's current financial circumstances are not likely to improve enough to permit him to make loan payments on the debt, much less repay the debt. *See Frushour*, 433 F.3d at 401. The debtor's education by itself has not led to sufficient income to repay the rapidly growing student loan debt, and nothing in the record shows or supports a finding that Mr. Bell's education is likely to lead to a material change. His lack of professional licenses limits his salary options and potential. His employment history and previous income show he has had financial hardship and debt burden rather than an ability to repay the loans. His efforts to find higher paying jobs have been stalwart yet unsuccessful.

---

[17]    *GS-9 Pay -2021 Federal GS Payscale*, FEDERALPAY, https://www.federalpay.org/gs/2021/GS-9.

[18]    *Id.*

[19]    This Court uses this figure as an example amount; the DOE's April 3, 2019, letter to Mr. bell noted that this amount ($1,176.40) would be Mr. Bell's monthly payment amount if he failed to recertify or no longer had a partial financial hardship as of May 2020. *See* Ex. G at 1, ECF Doc. No. 52-7.

Mr. Bell's state of affairs has persisted during the entire repayment period to date. The evidence Mr. Bell has filed with this Court coupled with his testimony persuades this Court that his state of affairs is likely to persist during the balance of the repayment period. This Court finds Mr. Bell has satisfied prong two of the *Brunner* test. It is futile to expect Mr. Bell will repay the loans because he will not obtain income in amounts necessary to repay the loans during the balance of the repayment period, and certainly not repay the loans while maintaining a minimum standard of living. Given the outstanding amounts of the loans and the interest rates, even with the best salary Mr. Bell can obtain, and even if he works long into his 70s and 80s, he will not be able to maintain a minimum standard of living and repay the indebtedness, which continues to grow daily. Given these facts, Mr. Bell's ability to repay this debt is certainly hopeless.

The DOE, in both its pleadings and arguments at trial, focused largely on the availability of its income-based repayment plan. Mr. Bell is participating in such a plan. This income-based repayment plan allows Mr. Bell to make payments of zero dollars per month on his student loans based on his current income. Under this plan, Mr. Bell's monthly payment will be zero dollars per month unless his income rises to a level sufficient, in the DOE's opinion, to make payments on his student loans. All the while, interest continues to accrue on the loans. Mr. Bell must recertify every year while he is under this plan. After 240 months in this plan, Mr. Bell may qualify for forgiveness of the remainder of his student loans. *See, e.g.*, Joint Stip. of Facts ¶¶ 5–6, ECF Doc. No. 27. If Mr. Bell receives such forgiveness, he stands to face tax liability on the total amount of debt forgiven (including the interest accrued over the twenty-year period), which he would not face with a discharge of the debt in bankruptcy. *See* 26 U.S.C. §§ 61(a)(11), 108(f), 108(a)(1)(A).[20]

---

[20] Mr. Bell estimates if he participates in the program for its entirety, the total student loan debt will have increased to approximately $402,576. Whether the total loan balance increases to that amount or stays the same, the discharge of indebtedness income and tax liability will be substantial.

If he does not participate in the program, he must obtain sufficient disposable income to pay the interest and principal to pay the debt during the remaining term of the loan, which will require significantly higher income than he has currently, has had, or will be able to obtain.

The DOE argues that the simple availability of this alternative repayment plan calls for a finding that Mr. Bell does not satisfy prong two. Based on Mr. Bell's current circumstances, the DOE allows him to make monthly payments of zero dollars. In the event his circumstances change for the better, which has been shown to be very unlikely, the DOE will require him to make payments based on his improved circumstances.[21]

The *Brunner* test focuses on repayment of the student loan. Payment of zero dollars a month under a separate program cannot fairly be considered a repayment of the loan. In other words, the inquiry is not whether participation in a repayment program for twenty years for an ultimate forgiveness would be an undue hardship; the inquiry according to the *Brunner* test is whether *repayment* of the loan over the repayment period would be an undue hardship.

Plus, section 523(a)(8) exists for a reason. Congress did not eliminate the ability to obtain a discharge of student loans in bankruptcy under section 523(a)(8) by devising alternative statutory repayment programs for certain federally guaranteed loans. It is hard to imagine a debtor who would qualify for a discharge under section 523(a)(8) but who would not also qualify for an income-based repayment plan at zero dollars per month. If this Court were to accept the DOE's argument on this point, section 523(a)(8) would be rendered essentially meaningless—the DOE

---

[21]     The DOE suggested that Mr. Bell may be able to make partial payments at some point in his future. Even if Mr. Bell submits partial payments, those partial payments will not repay the debt. Partial payments will not stop the interest and growth of the debt. Partial payments will not reduce the burden on the DOE from servicing the debt. Partial payments will not reduce the expense on the DOE for issuing statements, requests for certification and documentation in support, processing the same, reviewing and evaluating the same, and responding on the same. For that matter, zero-dollar monthly payments impose a burden on the DOE without any benefit of repayment.

could prevail in any case involving section 523(a)(8) by simply offering the debtor an alternative repayment plan like it did for Mr. Bell.

Section 523(a)(8) should not be rendered meaningless when the debtor is offered a repayment plan at zero dollars per month. This Court considers Mr. Bell's ability to *repay* the loan, which is not the same as deferring repayment by characterizing current "payments" as zero. Mr. Bell's student loan debt is increasing day-by-day as interest continues to accrue while he participates in this income-based repayment plan at zero dollars per month. This Court joins Judge Benjamin A. Kahn of the Bankruptcy Court for the Middle District of North Carolina in refusing to "jump the logical chasm necessary to conclude that no payment constitutes repayment, regardless of the title that the lenders choose to give to a program that excuses the debtor from repaying [his] loans." *Nightingale v. N.C. State Educ. Assistance Auth. (In re Nightingale)*, 529 B.R. 641, 650 (Bankr. M.D.N.C. 2015).

Moreover, this Court finds that participation in this income-based repayment plan for twenty-years—into Mr. Bell's late-eighties—imposes hardships regardless of whether his minimum payment remains at zero dollars per month. These hardships include the practical difficulties of re-certifying his income and expenses every year as he continues to near the age of ninety and "the continuing growth of the total debt (due to deferral of payment) over the course of the plan, the debtor's ability to obtain future credit, and the mental and emotional impact on the debtor of the mounting debt." *Swafford v. King (In re Swafford)*, 604 B.R. 46, 52 (Bankr. N.D. Iowa 2019).

This Court finds that Mr. Bell has met the second prong of the *Brunner* test. This Court has evaluated the evidence presented by Mr. Bell at trial in determining whether he made an adequate showing to satisfy prong two; the fact that he is participating in an income-based

repayment plan that requires no payments and allows for forgiveness after twenty years is not determinative of his certainty of hopelessness of repayment of the debt. If anything, Mr. Bell's participation in this program—as discussed below—is an indicator of Mr. Bell's good faith in satisfaction of prong three of the *Brunner* test.

### C. Prong Three

After the debtor has proven the first two requirements of the *Brunner* test, he then must satisfy the third element of the test to permit a bankruptcy court in this jurisdiction to discharge his student loans. Under the third prong of the test, this Court must find that the debtor has "made a good faith effort to repay the student loans." *Frushour*, 433 F.3d at 400; *Brunner*, 831 F.2d at 396.

The parties dispute whether Mr. Bell has satisfied this prong. On the one hand, the DOE points to the accepted fact that Mr. Bell has not made any payments on the student loans at issue at any point since graduating from Strayer University. On the other hand, Mr. Bell points to the accepted facts that he has remained in communication with the DOE, pursued his options to avoid defaulting on the student loans, and has done all that was required of him to ensure his loans remained either in forbearance or under a repayment plan. Mr. Bell submits that the fact he has made no payments towards his student loans is not determinative of his good faith—particularly when the DOE has admitted that Mr. Bell was eligible for the forbearances and zero-dollar payment plans granted to him. On top of this, Mr. Bell notes his unsuccessful attempts to secure employment sufficient to allow him to make payments on the loans.

This Court has been provided with no case law holding that the debtor make a certain number of payments on his loans to demonstrate a good faith effort to repay the loans. This is particularly so when the debtor's circumstances qualify him for forbearance of his loans and a

zero-dollar payment plan.  In other words, "[t]he failure to have made any repayments on a student loan is not a litmus test for good faith under the third prong of the *Brunner* test.  The good faith determination depends on the reasons why the Debtor did not make the payments."  *Roundtree-Crawley v. Educ. Credit Mgmt. Corp. (In re Crawley)*, 460 B.R. 421, 446 n.36 (Bankr. E.D. Penn. 2011).

The DOE granted Mr. Bell's requests for forbearances and placed Mr. Bell into a zero-dollar payment plan because his circumstances rendered (and continue to render) him unable to make payments on the loans.  *See* Ex. B at 5, ECF Doc. No. 52-2; Ex. C at 5, ECF Doc. No. 52-3; Ex. D at 5, ECF Doc. No. 52-4; Ex. E at 6, ECF Doc. No. 52-5; Ex. G at 1, ECF Doc. No. 52-7. The DOE now argues, despite this financial hardship, his failure to tender payments while the loans were in forbearance or under a zero-dollar payment plan shows a lack of good faith.  The DOE cannot reasonably argue that Mr. Bell has intentionally caused his circumstances rendering him unable to make payments on the loans.  This Court finds no indication that Mr. Bell deliberately chose to live on the edge of homelessness to avoid repaying his student loans.

This Court finds Mr. Bell made no payments on the loans because his financial situation simply rendered him unable to do so.  Mr. Bell qualified for programs offered by the DOE to allow him to forego making payments so that he could afford to live.  Mr. Bell took advantage of those programs.   This Court finds that Mr. Bell's efforts to secure employment, continued communication with the DOE with respect to his loans, and his successful requests for forbearances and alternative repayment programs indicate Mr. Bell's good faith efforts to repay the loans.   Rather than completely ignoring the loans, Mr. Bell remained on top of the administration of his student loans for the entirety of their existence and only requested a discharge of the student loans when his insolvency forced him to file bankruptcy in this Court.

Mr. Bell's good faith is reflected in his pleas to this Court:

> I took this thing very seriously. . . . I've tried to get the employment to repay the loan. It was never ever an intention of mine to borrow this money and walk away from the loan, get the job and walk away from the loan. Why would a person sixty years old work all day and then work all night to get a job for nothing? I mean, I was earnestly trying my best to get myself in a position to where I would have a decent job with a retirement program . . . .

Tr. at 59:8–16.

Mr. Bell has made good faith efforts to repay the student loans. Thus, Mr. Bell has met prong three of the *Brunner* test.

### CONCLUSION

Section 523(a)(8) does not outright forbid the discharge of student loans; it excepts from discharge student loans the repayment of which would not impose an "undue hardship" on the debtor.

Mr. Bell has shown this Court that he has met the three prongs of the *Brunner* test to show that repayment of the student loan debt would impose an undue hardship on him. Mr. Bell has shown this Court that facts and circumstances prevent him from repaying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts. Mr. Bell has shown that his current circumstances are likely to persist during a significant portion of the repayment period and that he has made a good faith effort to repay the loan. In all, Mr. Bell has proven repayment of his student loans would impose an undue hardship on him. For these reasons, this Court will enter an order granting his Complaint and discharging his student loans.

The Court will issue a separate order based on the conclusions in this opinion.

The Clerk is directed to send a copy of this Memorandum Opinion to the plaintiff by email to wmbell@aol.com and by mail to William Marshall Bell, 761 Front Royal Pike, Apt 304,

Winchester, VA 22602, and to send a copy to counsel for the U.S. Department of Education, Justin

M. Lugar, Assistant United States Attorney, P.O. Box 1709, Roanoke, VA 24008-1709.